No. 4795.

(Court of Appeal, Parish of Orleans.)

## FRANK DAVIES vs. THE RASCON MANUFACTURING & DEVELOPMENT COMPANY.

Clegg & Quintero for plaintiff and appellee.
Hall & Monroe for defendant and appellant.

### Statement of Case.

ST. PAUL, J.—Plaintiff sues on a promissory note for

— 73 —

$1,722.50 with interest at 7 per cent. from October 8, 1907; and 10 per cent. attorney's fees.

Defendant pleads failure of consideration, averring that the note was given in part payment for a locomotive manufactured by plaintiff, which by reason of plaintiff's failure to comply with specifications is not worth more than $3,445.00, the amount already paid thereon by defendant. Eleven instances of failure to comply with specifications are given.

Defendant also claims in reconvention the following items of damage, in all $5500.00, viz:

1. $2,000.00 for cost of repairing curves and changing the radius thereof made necessary by reason of the wheel base of said locomotive having been made 8 feet instead of 7 as called for by the specifications.

2. $1,000.00 for cost of raising bridges made necessary by reason of the top of the smoke stack being 11 feet 2½ inches above top of rails instead of 11 feet even, as called for by the specifications.

3. $1,000.00 for damages done to a track by reason of said locomotive weighing 46,640 lbs. in working order and 39,644 lbs. on the drivers, instead of 36,000 lbs. in working order and 30,000 lbs. on the drivers, as guaranteed in the specifications.

4. $1,000.00 for annoyance and inconvenience of having a defective locomotive delivered, and for injury to defendant's credit and standing by the filing of this suit.

5. By supplemental answer, $500.00 for delay in delivering locomotive on October 8, 1907, instead of in eight weeks from July 12, 1907.

The District Court gave judgment for plaintiff as prayed for and allowed defendant a credit of $101.00.

## Opinion.

The facts in this case so far as they are undisputed are as follows:

Defendant owns a tract of 1,000,000 acres of land situated near Rascon Station in the State of San Louis Potosi, Republic of Mexico, part of which is under cultivation as a sugar plantation.

Some time in 1905, and subsequently thereto, plaintiff sold defendant a small locomotive and 18 kilometers of 20-lb. steel rails. In 1907, defendant through its president Dr. Geo. H. Lee, authorized one Freeman, the secretary and general manager, to purchase a large locomotive and the latter, after investigation, purchased the locomotive which gives rise to this controversy. The price was to be $5,167.50, payable one-third in cash on receipt of bill of lading, one-third November 1, 1907, and one-third February 1, 1908. By mutual consent the last two payments were deferred to January 1st and March 1st, respectively, and notes were given therefor. The locomotive was to be delivered F. O. B. cars at Wilkesbarre, Pa., eight weeks from July 12, 1907, and was actually loaded on cars October 4, 1907.

The locomotive reached the Rascon Station some time in November, 1907, and was taken to the plantation some days later. It was not then weighed or measured, but one Wm. Stites, an assistant engineer, made an examination thereof and reported the following variations from specifications, five in number, viz:

1. Boiler provided with only two hand-hole plates instead of four.

2. Side-rods solid instead of jointed.

3. Tender equipped with hand brakes instead of steam brakes.

4. Only one headlight instead of two.

5. No ventilator in top of cab.

This report was reduced to writing February 1, 1908. (See Davies 2.)

The cash payment of $1,722.50 was promptly made on receipt of the bill of lading. On January 2, 1908, the first note being then due, Thomas H. Royer, treasurer, and Ernest Eager, Jr., secretary of the defendant company called on plaintiff and endeavored to have the payment thereof deferrred, informing plaintiff orally that the locomotive did not conform to the specifications, but they made no mention of details as they themselves did not have the particulars. Plaintiff, however, insisted on immediate payment and agreed to make good any deficiencies. (Testimony Thos. Roger, p., 64; E. Rogers, Jr., p. 68.)

On February 13, 1908 (see Doc. Plff. 3), Stites' report of February 1st, (Doc. Davies, 2), was transmitted to plaintiff and he was informed by letter that the deficiencies must be supplied before final settlement. Plaintiff acknowledged this letter at once, expressed his willingness to supply the deficiencies and stated that he was taking up the matter with the works that very day. He further invited attention to the fact that although the locomotive had been delivered at the plantation since November, 1907, this was the first official notice of the deficiencies therein which matter he mentioned simply in connection with the last clause of the defendant's communication and for the purpose of reminding defendant that the matter had no bearing on the obligation due March 1st coming. (See Doc. Pltff. 4.)

On February 24, 1908, plaintiff again wrote defendant (after hearing from the works) explaining how the deficiencies had occurred, and offered to supply same at once without cost to defendant, or if defendant preferred to allow $100.00 as an offset. He asked for prompt answer (see Doc. Pltff 5). This letter was addressed to the local office and was tranrmitted to the president then at Rascon (see Document Plaintiff 6) from whom, how-

ever, no answer or acknowledgment was ever received (testimony Davies, p. 36).

The obligation due March 1, 1908, was not paid at maturity. On March 3d plaintiff, through counsel, threatened suit (see letter Clegg & Quintero, March 3, 1908). On March 6th suit was filed.

On March 11th, defendant's president, then at Rascon, caused the locomotive to be weighed, measured and re-examined, for the avowed purpose of finding objections to be urged against same. (Testimony Dr. Lee, pp. 39-40.) On this occasion the following additional variations from specifications were discovered; six in number, viz.:

1. Wheel base 8 feet instead of 7.

2. Height to top of stack 11 feet 2½ inches instead of 11 feet even.

3. Length of locomotive over all 40 feet 6 inches instead of 41 feet 4 inches.

4. Weight of locomotive in working order (three gauges of water) 46,640 lbs. (?), of which 39,644 lbs. on drivers; instead of 36,000 lbs. in working order, of which 30,000 lbs. on drivers.

5. Only 83 boiler tubes instead of 85.

6. Locomotive has an ordinary whistle instead of a Chime Whistle.

On March 8th the answer herein was filed, followed by the supplemental answer April 1, 1908.

The several matters complained of herein will be considered separately, as follows:

## I.

The damages claimed for delay in the delivery of the locomotive cannot be allowed. There is no evidence that

defendant suffered any damage thereby (Vincent, p. 10; Stites, pp. 4-5), nor was the delay ever complained of until the filing of this suit. (C. C., Art. 1933.) Moreover, whilst the locomotive was to be delivered F. O. B. at Wilkesbarre, eight weeks from July 12, 1907 (i. e., Sept. 10, 1907), it was actually ready for shipment on Sept. 18th, but shipment was delayed until October 4, 1907, at the request of defendants' agent Freeman whilst looking for a cheaper rate of freight. (Testimony, Freeman, pp. 19-20; Davies, pp. 58-59.)

## II.

The claim for $1,000 for annoyance and inconvenience caused by the delivery of a defective machine and for injury to defendant's credit by the filing of this suit is altogether untenable. Defendant did not even know of many of the alleged deficiencies until after this suit was filed and a critical examination had been made; and, as to those of which it had knowledge, apparently it did not think it worth while to complain until within a few days of the maturity of the last obligation. The annoyance and inconvenience could not ,therefore, have been very serious. Moreover, plaintiff, to the knowledge of defendant, transmitted the order as received, to the locomotive works by whom the locomotive was built and shipped direct to defendant. He had no knowledge of the deficiencies and was in perfect good faith; hence, he cannot be liable for damages of this nature. (C. C., Art. 1934.)

As to any injury which might have resulted to defendant's credit by the filing of this suit, the damages are both remote and not proven; moreover, it is **damnum absque injuria.** Plaintiff sued on a written and unconditional obligation and it is inadmissible to suppose that one could bring suit on such an obligation only at the risk

of being mulcted in damages should the defendant succeed in setting up a defense or establish an offset.

## III.

An additional 2½ inches in the heighth of the smokestack, and a deficiency of 10 inches in the length of the locomotive, over all, do not, in our opinion, affect in the slightest degree the efficiency or value of the locomotive. As to the raising of the tops of the bridges, the evidence shows that the bridges were previously only ten feet high, and that defendant had in contemplation, if indeed it had not already done so, to raise them to 12 feet so as to accomodate an eleven foot stack, which would also have admitted a stack 11 feet 2½ inches. (Testimony Freeman, p. 15; Vincent, p. 10; Stites, p. 6.) But, at any rate, the proper remedy would have been, not to raise the bridges, but to cut off the extra 2½ inches from the bottom of the stack at a mere trifling expense.

## IV.

The evidence shows that a reduction in the number of tubes in the boiler so as to put them ⅝ inch apart instead of 9-16 in order to meet the water conditions at Rascon was authorized by defendant's agent Freeman. (Testimony Freeman, pp. 18-19; Davies, pp. 33-34.)

## V.

Solid side rods instead of jointed seem to have been an advantage. (Document Davies 2, item 2.) There is no evidence as to the difference in value if any, and defendant makes no mention of the matter in its brief.

## VI.

That the locomotive was supplied with an ordinary whistle instead of chime whistle, had two hand-hole

plates instead of four, one headlight instead of two, no ventilator in the cab, and hand-brakes instead of steam-brakes in the tender does not detract from the value of the locomotive except to the amount necessary to supply these deficiencies, say $206, as follows: Whistle, $35; handhole plates, $13; headlight, $25; ventilator, $12; steam-brakes, $21; total, $206. This amount should be allowed in reconvention.

The steam brakes seem to have been shipped to Rascon Station, but no notice of the fact was given to defendant, which denies the receipt thereof or any knowledge on the subject. So far as the record shows they may still be lying at Rascon Station. Defendant is entitled to credit for their value, but plaintiff's right to claim them wherever found will be reserved. The same may be said of the headlight and chime whistle.

## VII.

The evidence shows that the change from a seven-foot wheel base to an eight-foot wheel base was authorized by defendant's agent Freeman at the suggestion of the Vulcan Iron Works; that a seven-foot wheel base would marr the appearance as well as the efficiency of the locomotive by making her too compact and crowded. (Testimony Davies, pp. 30-31-33; Freeman, pp. 10-11-13; document Davies 1.)

## VIII.

The chief complaint urged by the defendant is in the matter of the excess in weight of the locomotive over the weights mentioned in the specifications.

These call for "Weight in working order about 36,000 pounds, 30,000 on driving wheels guaranteed," the word **guaranteed** being added apparently **ex industria**—i. e., typewritten at the end of a printed form.

The shipping weight of the locomotive according to E. J. O'Brien, superintendent of the locomotive works (i. e., without water in boiler or fuel in box) was 37,000 lbs. With 3,600 lbs. added for fuel in the fire box and three gauges of water in boiler, the total weight of the locomotive in working order would be 40,600 lbs., of which 34,800 lbs. would rest on the drivers. (O'Brien, Int. 5-6.)

Tom J. Lee, vice-president and general manager of the defendant, found the total weight of the locomotive, with fuel in fire box and one gauge of water in boiler, to be 44,990 lbs., according to the scale on the defendant's plantation, of which 38,610 lbs. rested on the drivers. This is corroborated by Stites and Breaux. (Testimony Stites, Int. 13; Breaux, Int. 13.)

According to Stites two gauges of water added would have increased these weights about 1,000 lbs. (Testimony Stites, p 21.) Tom Lee found that with three gauges of water the weight on the drivers was 39,600 lbs. or 990 lbs. more than with one gauge of water only. The total weight of the locomotive with three gauges of water exceeded the capacity of the scale 20,500 kilograms, equal to 45,100 lbs.

Tnerefore, with three gauges of water, the total weight of the locomotive on defendant's scale would be (44,990 x 990) 45,980 lbs., of which 39,600 lbs. rest on the drivers.

The actual weight, as found by the two sides, were as follows:

According to O'Brien: Total weight, 40,600 lbs.

According to O'Brien: Weight on drivers, 34,800 lbs.

According to Tom Lee: Total weight, 45,980 lbs.

According to Tom Lee: Weight on drivers, 39,600 lbs.

But the evidence shows that part of this weight was due to changes in the specifications authorized by de-

fendant's agent Freeman (Testimony Freeman, p. 10; Davies, p. 39; O'Brien, Int. 7-10; Doc. Davies 1), viz.:

300 lbs. by making drivers 33 inches instead of 32.

490 lbs. by making smokestack bell shape instead of taper.

In all 790 lbs. were added, of which about 85% rested on the drivers. For, according to specifications, the weight on drivers was to be 83 33-100% of the total weight; according to O'Brien's weight, it was actually 85 71-100%; according to Tom Lee's weights, 86 12-100%.

So that in ascertaining how much the actual weights exceeded the weights mentioned in the specifications, allowance must be made for these added weights, and 790 lbs. should be deducted from the total weight, and 85% of that, or 672 lbs., from the weight on the drivers.

Deducting these allowances, the weight would be as follows:

According to O'Brien: Total weight (40,600—790), 39,810 lbs.

According to O'Brien: Weight on drivers (34,800—672), 34,128 lbs.

According to Tom Lee: Total weight (45,980—790), 45,190 lbs.

According to Tom Lee: Weight on drivers (39,600—672), 38,928 lbs.

From these figures it results that the actual weights, with fuel in fire box and three gauges of water, exceed the weights mentioned in the specifications as follows:

According to O'Brien:

Excess in total weight (39,810—36,000), 3,810 lbs. 10 58-100%.

Excess in weight on drivers (34,128—30,000), 4,128 lbs., 13 76-100%.

According to Tom Lee:

Excess in total weight (45,190—36,000), 9,190 lbs., 25 53-100%.

Excess in weight on drivers (38,928—30,000), 8,928 lbs., 29 76-100%.

At the time the locomotive was weighed by defendant the scales were tested in a somewhat crude and informal manner which may or may not have indicated that they were correct, and some months later they were inspected by a government officer who certified to their accuracy.

But the evidence shows that both the situation of the scales and method of weighing adopted were by no means the most favorable for obtaining accurate weights.

The platform itself seems to have been level, but the scales stood on rising ground; and, when the locomotive was weighed, the tender was attached. (Stites, p. 13; Dr. Lee, pp. 40-41-42.)

Now the locomotive in controversy was similar in style and construction to the locomotive "J. G. Powell," of which a photograph is annexed to the specifications attached to defendant's answer. On a basis of 41 feet over all and an 8 feet driving wheel base, it would be just possible to admit the six driving wheels of the "J. G. Powell" upon a scale without also admitting the pony truck in front and tender truck behind, provided the platform of the scale did not exceed twenty feet in length.

Inasmuch as even a 20-foot platform appears to us rather small for a railroad scale, it must have been quite a delicate operation so to place this heavy locomotive as to obtain the correct weight resting on the drivers alone, especially with a heavy tender attached.

Stites (page 20) does not think the weights obtained by defendant were accurate. The witness Luck, an expert in these matters, testified (page 20) that there must be some error about them; also, that it would be easy for the locomotive people to figure the weight within 5%.

In this way O'Brien, the superintendent of the locomotive shops gives the weight of this locomotive, based on that of similar locomotives actually weighed, and as was seen, there is a very considerable variation between O'Brien's figures and those of defendant.

Again, the testimony of Palma, Yard-master of the Mexican Central Railroad, may not be admissible to prove the actual weight of this locomotive, but the fact that the weight of this locomotive, as preserved in the records of the railroad company, varies materially from that found by defendant is a circumstance which may well be considered, among others, in determining whether we will accept defendant's weights as conclusive.

Moreover, we find it hard to believe that a manufacturer of locomotives is so ignorant of the product of his factory and of his business generally that he miscalculates by over one-fourth the amount of material required to build his machines, and puts into the construction thereof nearly five tons of costly, high-grade steel more than he figures on.

This much, however, seems quite certain, that the total weight of the locomotive was at least 39,810 lbs., and the weight on drivers at least 34,128 lbs., being an excess in the total weight of 3,810 lbs., or 10 58-100%, and in weight on drivers of 4,128 lbs., or 13 76-100% over the weights mentioned in the specifications. And the question is whether plaintiff is at fault.

At the outset we may frankly say that we are not favorably impressed with the sincerity of the defendant's contentions. The locomotive was accepted and used without protest or complaint until it came time to meet the first note. Then in a general way plaintiff was told that there were some deficiencies, but was given no details. Just as the last note was about to mature, certain definite particulars were given plaintiff, and he was notified that he

must remedy them before payment would be met. It was only when suit was actually filed that all these grave objections were found, and, the first notice thereof to plaintiff was the answer filed herein.

We have already referred to the unreasonableness of defendant's claim for the cost of raising its bridges.

Again the evidence shows that the defendant's roadbed and bridges were in no condition to support even an 18-ton locomotive as this was supposed to be. The roadbed had very little ballast, the ties were spaced too far apart, and the bridges were not strong enough. The manager had been notified of these facts and advised to strengthen the bridges with hog-chains. (Testimony Vincent, p. 3; Stites, pp. 5-7.) This work had already been begun before the locomotive was ever used. (Vincent, pp. 2, 4, 7.)

Now it is practically the cost of reconstructing the roadbed and bridges that defendant is seeking to recover herein.

Dr. Lee testifies (page 9) that all the bridges have been strengthened, the track reballasted and new and larger ties put in. The La Mula bridge was strengthened in accordance with original plans (page 12) and afterwards it was found that hogchains were needed (page 13).

Stites testifies (page 7) that the ties were formerly 30 inches between centers (making 1,317 ties per kilometer of 39,500 inches) and many were in bad shape and having sign of rot. Dr. Lee testifies (page 12) that the ties are now two to each meter (39½ inches per meter), equal to 19¾ inches between centers, making 2,000 ties per kilometer. Thus 683 ties per kilometer have been added to the roadbed.

As half of the ties, or 1,000 per kilometer, are new (Dr. Lee, p. 12), that leaves 317 new ties per kilometer to

replace the rotten ties testified to by Stites, not such a great number, considering that the annual cost of repairs in preceding years was about half the whole expenditure for the year 1908. (Testimony Dr. Lee, p. 60.)

These expenditures, therefore, represent, in our opinion, actual betterments and not repairs; betterments needed and contemplated to support an 18-ton locomotive, and actually commenced before the locomotive 'in controversy had ever reached the defendant's plantation.

But to return to the question of over weight, which we have seen was at least $10\frac{1}{2}\%$ in the total weight of the locomotive, and $13\frac{3}{4}\%$ in the weight on drivers.

It is admitted that the lightest rails which it is advisable to use under a locomotive should weigh in pounds per yard eight times the weight in tons on each driver. Thus on 20-pound rails the weight on each driver should not exceed $2\frac{1}{2}$ tons (5,000 lbs.), or 30,000 lbs. on six drivers. So that the 30,000 lbs. on drivers which defendant insisted should be guaranteed, was the very limit of weight that should be put on 20 pound rails.

The testimony shows (Luck, pp. 15, 16, 17) and it appeals to us as common sense, that it is impossible in advance to tell within $7\frac{1}{2}$ to 10% the weight of a large machine such as a locomotive when completed. A matter or 5 to 7% would not be considered at all. So that a variation from estimated weights can scarcely be avoided and is to be expected.

Again we gather from the testimony (Dr. Lee, pp. 25, 26, 27; Freeman, p. 17), and from the fact that a guarantee was specially exacted as to the weight on drivers (and it is after all only a proposition in simple mechanics), that for a given power the efficiency of a locomotive is in proportion to the weight resting on the drivers. Added weight means increased friction—i. e., greater

hold on the rails—and this means increased traction force.

Finally defendant's agent, Freeman, himself added 300 lbs. to the weight of the locomotive by authorizing the increase in the size of drivers from 32 inches to 33 and 500 lbs. merely by directing that the smokestack be made bell shape instead of taper. He even sought to increase the size of the boiler, which would have added still further weight both in metal and in the amount of water that might be carried in the boiler. (See Doc. Davies 1; testimony Freeman, p. 10; Davies, pp. 11-39; O'Brien Int. 7, 10.)

Nor does it seem ever to have occurred to defendant, even after the experience on the La Mula bridge, that the weight of this locomotive was a disadvantage; not in fact until this suit was filed and defendant began to look for grounds of objection to the locomotive.

Under the circumstances plaintiff was, in our opinion, fully justified in acting on the assumption that the guarantee of 30,000 lbs. on drivers meant the **minimum**, as it would generally have been understood by persons in the trade. (See testimony Luck, p. 5.)

We are of opinion that a contract to deliver a locomotive weighing **about** 36,000 lbs. is not violated by the delivery of one that weighs some 10 or 15% more than that; and a guarantee that not less than 30,000 lbs. shall rest on the driving wheels is complied with when the weight on the drivers is some 34,000 lbs.

Nor does the fact that plaintiff had previously sold defendant some 18 kilometers of 20-lb. rails alter the situation in any way. Plaintiff had also sold defendant a smaller locomotive (about 7 tons) for use on those rails. (Davies, pp. 54, 55; Vincent, p. 3; O'Brien, Int. 16.) He had no reason to know that he alone had sold rails to the defendant; to sell the locomotive he had to meet competition.

Nor had he any reason to know that some nine or ten miles (18 kilometers) of 20-lb. rails were all the rails or tracks on a plantation of over one million acres (over 1,500 square miles) on which cattle and corn, as well as sugar and alcohol, were raised. (Davies, pp. 29, 30, 56; Dr. Lee, p. 60; Freeman, p. 4.)

Finally plaintiff swears, and is uncontradicted, that he knew nothing of conditions at Rascon, and did not know that the locomotive was for use on the 20-lb. rails, but, on the contrary, was given to understand that she was to be used between the sugar house and the station, and that he had no knowledge of the character of rails used in that stretch of track, where heavier rails are generally used. (Davies, pp. 49, 50, 54.)

## IX.

Some effort has been made to inject into this controversy an element of corruption which, however, does not appeal to us. Freeman, defendant's agent, borrowed of plaintiff $250.00 on the day the contract was signed, and $250.00 about a month later. Freeman testified that he borrowed the first $250.00 to pay a freight bill for defendant and the last $250.00 for his own account; whilst the indorsement on the checks might indicate that the reverse was true, viz.: That the first $250.00 was for his own account, and the last $250.00 for a freight bill. Be this as it may, both loans were repaid, the first within a few days, and the last some time later. Plaintiff swears that so far as he was concerned, both loans were made to Freeman as an officer of the defendant corporation and for account thereof, being so charged upon his books, and were made upon the representation that the money was needed temporarily to pay freight bills for account of

defendant. (Testimony Freeman, p. 33; Davies, pp. 44, 45, 46, 47).

Lastly both the appearances of corruption and motive therefor are wanting. The correspondence between Freeman and Dr. Lee seems incomplete but from what is before us and from the testimony we judge that the latter was kept informed as negotiations progressed and acquiesced in the proposition that plaintiff's bid, though nominally higher than that of a competitor, was in reality both lower and more advantageous. (See Docs. R-5, R-7; testimony Dr. Lee, p. 6.)

## X.

Nor do we attach any importance to the fact that the locomotive was not in use at the time this cause was on trial. As a matter of fact it had been in use during the whole of the grinding season (Dr. Lee, p. 39), and until it capsized after jumping the track at a point over which it had repeatedly passed before, especially during the previous ten days, and three times on that very day. (Testimony Sanchez, Int. 4.) The track at that point was apparently in good condition, although passed over repeatedly by the locomotive (Sanchez, Int. 4), and Sanchez, the resident manager of the plantation attributes the accident not alone to the fact that the locomotive is too heavy for the rails, but also to the fact that she is "too high in proportion to the width of the track (testimony Sanchez, Int. 5), a disadvantage in a mountainous district, which both plaintiff and Freeman appreciated and sought to minimize by suggesting to the locomotive works the advisability of lowering the boiler upon the frame (Doc. Davies 1), of all of which Dr. Lee was advised by Freeman in his letter dated "Friday Night"

(July 12th, 1907), the day the contract was signed. (Doc. R-7.)

## XI.

As to Freeman's authority to enter into the contract for the locomotive and regulate the details, we are of opinion that it was ample in the premises. Moreover it was ratified by performance—i. e., acceptance of the locomotive—making a partial payment and giving notes for the balance. It was also ratified when defendant sued for damages for breach thereof, especially such damages as claimed in the supplemental answer. Finally the contract is not even repudiated in this suit, all that defendant asks is a diminution of price because the locomotive, on account of alleged defects, is not worth as much as the contract price; defendant means to keep the locomotive for the amount already paid thereon.

We are of opinion that the judgment of the District Court is substantially correct, and with the slight amendment indicated in the opinion, it will be affirmed.

It is, therefore, ordered that the judgment appealed from be amended by increasing the amount allowed the defendant in reconvention from one hundred and one dollars to two hundred and six dollars, reserving to plaintiff, however, the right to recover of defendant, if in its possession, one steam brake, one headlight and one chime whistle; and, as thus amended, the judgment is affirmed.